IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GTS TRANSPORTATION CORPORATION, ROMAN BURZA, and TOMAS STIRBYS,

Plaintiffs,

v.

TEAM LINE, LLC; ARTHUR PROSKURINAS, ROMAN IESYPOV; KHALILILLO ABDULLAEV; SAULIUS LAURYNAS; and MAKSIM KARDASEV;

Defendants.

Case No. 24 C 1633

Chicago, Illinois
September 2, 2025
10:10 a.m.

TRANSCRIPT OF PROCEEDINGS - STATUS
BEFORE THE HONORABLE MARY M. ROWLAND

APPEARANCES:

For the Plaintiffs: ZANE D. SMITH & ASSOCIATES LTD.
BY: MR. BORIS G. SAMOVALOV
MR. ZANE D. SMITH
100 N. LaSalle Street, Suite 910
Chicago, Illinois 60602

LAW OFFICE OF MICHAEL C. GOODE
BY: MR. MICHAEL C. GOODE
100 N. LaSalle Street, Suite 910
Chicago, Illinois 60602

For Defendants excluding Arthur Proskurinas: LAW OFFICE OF FEDOR KOZLOV PC
BY: MR. FEDOR A. KOZLOV
1990 E. Algonquin Road, Suite 100
Schaumburg, Illinois 60173

APPEARANCES (Cont'd):

For Non-Party TRAFFIX: BENESCH FRIEDLANDER COPLAN & ARONOFF LLP
BY: MR. ANDREW J. JARZYNA
71 S. Wacker Drive, Suite 1600
Chicago, Illinois 60606

Also Present: MR. ROMAN IESYPOV
MR. KHALILILLO ABDULLAEV
MR. MAKSIM KHARDASEV

Court Reporter: LAURA RENKE, CSR, RDR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 1224
Chicago, Illinois 60604
312.435.6053
laura_renke@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: All rise.

(Call to order.)

THE COURT: Good morning.

THE CLERK: Calling Case No. 24 CV 1633, GTS Transportation Corporation, et al. v. Team Line, LLC, et al.

MR. GOODE: Good morning, your Honor.

THE COURT: Good morning.

MR. GOODE: Michael Goode on behalf of the plaintiffs.

MR. SAMOVALOV: Good morning, Judge. Boris Samovalov, S-A-M-O-V-A-L-O-V, here on behalf of the plaintiff.

MR. SMITH: Good morning, your Honor. Zane Smith on behalf of the plaintiff.

MR. KOZLOV: Good morning. Fedor Kozlov, K-O-Z-L-O-V, for the defendants Team Line, Roman Iesypov, Khalilillo Abdullaev, and Saulius Laurynas.

THE COURT: Okay.

MR. KOZLOV: And Maksim Kardasev. I'm sorry.

THE COURT: Okay. So now what's happening? Now it seems that the defendant who wanted to be cut loose, he was cut loose. He has signed the settlement agreement.

MR. GOODE: Judge, when we were last before you, there were two things that had to be resolved. One, as Mr. Fedor indicated, they wanted to make sure there was a five-day grace

period and a payment plan. We conceded to that point without any question in court. And there was also the question of getting this individual Arthur Proskurinas to sign. We obtained that signature early and turned it over as well. All was accepted.

And just to give a 60-second background, in December, on December 26 of 2024, we had a day-after-Christmas settlement conference downtown. Used the Union League Club and met at length, with all parties present and counsel.

We were unable to resolve. We couldn't move the needle at all, so we went back to our corners and prepared the case for -- towards trial. We received a call about two and a half months ago from defense counsel indicating that they needed to resolve the matter and get it done then.

They made an offer unsolicited. We conceded to that offer and worked on preparing documents that were detailing out what the agreement was. We got all the way to the finish line, and defense backed away.

THE COURT: Okay.

MR. GOODE: We then went back to our corners and prepared for trial.

Two months later we get the second call. Again, their number. They suggested the number. We conceded that point again, only this time we wanted to have the Court's involvement so they couldn't be a close to and back off again.

So on August 10th, we received this final offer. We conceded to every single term suggested by the defense. We even came to your court, and defense counsel stood up at the same podium and said, "We are in settlement, Judge. We have settled." The only thing was the five-day grace period and Proskurinas's signature, which we've turned over.

After we did all of that, now we hear this latest -- I don't know. I feel like I'm the jilted bride at the altar again, Judge.

THE COURT: Okay. What's the problem?

MR. KOZLOV: The problem is counsel -- I agree with counsel that as of last time when I came here in front of you, Judge, we asked them to make certain changes. I asked to withdraw from representation of one of the defendants.

THE COURT: Right.

MR. KOZLOV: And I asked that his signature be placed on the agreement.

THE COURT: And that has happened, right?

MR. KOZLOV: That has happened.

THE COURT: Okay. So what else do you need?

MR. KOZLOV: My clients informed me that a third party pressured them into this agreement, that it was done under duress, and they claim they cannot meet with the terms as far as the number goes. And they cannot sign this document because they were pressured, coerced to sign this agreement, to enter

into this agreement, and they refuse to sign today.

THE COURT: Okay. And who is the third party?

MR. KOZLOV: TRAFFIX. He's -- their lawyer is present right here.

MR. JARZYNA: If you'd like me to approach, my name is Andy Jarzyna. I represent TRAFFIX.

COURT REPORTER: I didn't hear your name.

THE COURT: Yeah, we didn't hear a thing you said.

MR. JARZYNA: I apologize.

THE COURT: That's okay. Come on up. Speak into a microphone.

MR. KOZLOV: Name of the business, T-R-A-F-F-I-X.

MR. JARZYNA: Yes.

THE COURT: Speak into that microphone.

MR. JARZYNA: Yes, T-R-A-F-F-I-X.

My name is Andy Jarzyna, J-A-R-Z-Y-N-A. And I'm at the law firm of Benesch, B-E-N-E-S-C-H.

THE COURT: Do you know the lawyers on the other side? Have you been negotiating with them?

MR. JARZYNA: I've talked to Fedor and Boris, and I just, like, today talked to Mr. Goode. But --

THE COURT: Okay. So you're the puppet master? Who are you? Who is your client?

MR. JARZYNA: So our client is TRAFFIX. Both of these entities have done work with TRAFFIX. And we've told both of

them. We've told both GTS -- or I told -- my predecessor at Benesch, Marc Blubaugh, told Boris basically, look. You want to do business with us. We don't want to be caught up in this litigation. You know, you shouldn't be involving us in this.

And then I essentially told the same thing to Fedor, basically, look. We have other options. TRAFFIX does. They're going to meet every single contractual obligation that they have, but we don't want to be caught up in this litigation. There are other alternatives that are not going to, you know, cause the problems that this litigation is causing for us.

So we told both of them we wanted them to work it out.

THE COURT: Okay.

MR. GOODE: By the way, Judge, when we were told that if we -- if they wanted -- if we were expected to continue doing business with TRAFFIX we would have to alter or drop this litigation, our response was do what you want. We do our litigation separately. We will not be held to account for that.

THE COURT: Okay. Okay.

MR. GOODE: We refuse to be involved in it.

THE COURT: Okay. So your client, Team Line --

MR. KOZLOV: Yes.

THE COURT: -- are they -- I have a bunch of individuals who are also named. Do they own Team Line?

MR. KOZLOV: They are right here, Judge.

THE COURT: Yeah.

MR. KOZLOV: I'm not sure if they own Team Line, but they have authority to make decisions for Team Line.

THE COURT: Okay. Because I see Team Line is an LLC. So Team Line --

MR. GOODE: One of them is the owner, Judge.

THE COURT: Okay.

MR. KOZLOV: One of them should be -- I don't know, but yes.

THE COURT: You should know that. You're the guy with -- who is signing documents as the lawyer. So you should know the answer to that.

So I have -- there's a couple of choices I have, right? They're going to make a motion to enforce the settlement agreement. And there's a lot of law about whether or not a settlement agreement can be enforced. So I'm going to rule on that motion. I don't know right now what the ruling is going to be. You're going to respond to it, I suppose, and say, gee, Judge, you shouldn't enforce the settlement agreement. So that will be the first thing we do.

If I don't enforce the settlement agreement, that means we litigate the case. It doesn't mean the case goes away. It means, okay. Where are we in the case? I don't know. I'll look at the docket. Are we done with discovery?

Have --

MR. KOZLOV: They --

THE COURT: -- we set a trial date?

MR. GOODE: Yes, it's all been done.

THE COURT: Let's set a trial date.

Okay. There we go. So then we're in litigation.

So I don't know if your clients think that by not signing this agreement, you know, poof, the case goes away.

MR. KOZLOV: No, they don't think like that.

THE COURT: Okay. So then they may still be found liable. You know, I don't -- I haven't looked at this case in a while, so I don't know what the allegations are. I don't know what the evidence shows. I don't know what -- if Team Line, LLC, is going to be found liable or any of these individuals who are named.

Now I have Mr. Proskurinas. He's pro se now. So we've got that wildcard at trial, right? I've got him at the table with no lawyer. That's great. That's great at trial, him asking questions. So if I don't enforce the settlement, that's where we're going.

Or I enforce the settlement and they have to make the payment plans as ordered. If they don't make the payment plans -- if they don't make the payments, then I get a motion to enforce.

If I don't enforce the settlement and they quit paying

you and they default, then I get a default judgment and they do enforcement actions on a judgment.

In the meantime, it sounds like both of you are risking your business with the big cheese here, who has the business to hand out, so kind of a pox on all of you, right?

So I don't -- I don't make the business decisions; I just apply the law. This is the second time you've been in this courtroom in two weeks trying to work out an agreement. I'd be happy to send you to a magistrate judge to try to resolve this. I'd be happy to try to sit down with you and resolve it. I don't -- I don't know what else to say.

I don't know how strong the liability claim is. Lots of people resolve claims even if they think they didn't do anything wrong. They resolve claims for business reasons. They resolve claims because the price is right. They don't have to pay the lawyer anymore.

I've got a hand up in the back. I don't know. I'm not a schoolteacher, but someone's raising their hand. Would you like to call on your client? Your client is waving his hand. Here he's on his feet.

MR. IESYPOV: My name is Roman, Roman Iesypov, I-E-S-Y-P-O-V.

THE COURT: Do you want to talk to your lawyer, or do you want to talk to me?

MR. IESYPOV: Well, I want to ask if we can sit with

you and to negotiate somehow that would be good, somebody to -- to get into the actual case and see what is going on and help us to settle it or somehow to go into litigation. We are ready -- we do understand, you know, if the judge will find us, you know, guilty, liable. We do understand that.

THE COURT: Okay. Well, I don't think I find anybody liable.

Is this a jury trial?

MR. SAMOVALOV: Yes, Judge.

THE COURT: Okay. Is it a contract case? What is the issue?

MR. SAMOVALOV: So there are several issues, your Honor. One issue is essentially, to summarize, a hacking case.

THE COURT: Uh-huh.

MR. SAMOVALOV: We're alleging that their company hacked into our system, stole data, and then they used that information to -- for benefit themselves.

Part of it is intentional interference. TRAFFIX is the subject, and that's why TRAFFIX is involved, because they don't want to be subject to discovery.

And there are other allegations in terms of interfering with our clients' business, taking employees and so on. So it is a complex case with many different moving parts.

THE COURT: Is the only reason you're here diversity?

MR. SAMOVALOV: The reason is the hacking counts are

brought under federal statutes, the Stored Communications Act and there's another one. I apologize I don't have the full name.

THE COURT: So you're really here.

Okay. So you want to sit down and talk. I mean, the thing is they feel they have a settlement agreement. So if you open up that settlement agreement, you're losing your motion to enforce the settlement agreement. So --

MR. GOODE: Let me say this.

THE COURT: -- you have to make a decision about that.

MR. GOODE: We would not be opposed to giving, again, an ear to the Court -- an ear of the Court to listening to the defendants so long as we don't be considered to be waiving our position regarding settlement. We believe we have a firm settlement.

THE COURT: I don't know what the law is on that. I honestly don't. If you file a motion to enforce the settlement agreement --

MR. GOODE: We have done that.

MR. SAMOVALOV: Oh, no, we have not. Not yet. Not yet.

MR. GOODE: No, we haven't done that yet.

THE COURT: If you do that, even if you do it today or you do it tomorrow, and then you go back to the negotiating table -- I honestly don't know the law on that area -- I think

at that point you're saying we're open, you know.

MR. GOODE: I've never been in the situation where we've gone this far, to have the Court hear both parties say we're settled, and then have it pulled away. I've never seen it before.

THE COURT: So I think you'd have to look at the law on that because if I were the plaintiff, I would respond and say, well, we had a settlement agreement on August X, and then we met with you on September Y. And so --

MR. GOODE: I don't want to weaken that position.

THE COURT: Well, I would -- I don't know the law in that area. You know, you're saying you had an agreement.

MR. GOODE: We have an agreement. That's obvious.

THE COURT: And then you're -- but I would -- I would set a date for you to come back, and I would be happy to talk to you about the case to try to get it resolved. Otherwise, I'm setting discovery dates and I'm getting the case on track.

MR. GOODE: Now, I could suggest that perhaps if for some reason the defendant believes further issues need to be resolved, they could go to private mediation. We could attend. That would not in any way impact if everybody agreed it does not impact --

THE COURT: Well, I don't know about that. I would check the law on that. But you do what's right for your client.

MR. GOODE: One second, Judge.

(Counsel conferring.)

MR. GOODE: Judge, I would suggest that the Court set seven days for the plaintiff to file a motion to enforce or to otherwise proceed and then have a status date set shortly after that to set --

THE COURT: That's fine.

MR. GOODE: -- a briefing schedule on whatever we do. During that time, we continue to talk to defense counsel and see what their position is because I don't understand why there's any recalcitrance at this position.

THE COURT: That's fine.

Okay. So September 9th to file your motion to enforce. I'm going to look at the -- can somebody tell me -- and I should know this -- is discovery closed? Like, where are we at with -- so I see that I stayed discovery on August 12th.

MR. SAMOVALOV: No, Judge. Yes, so there was a new development in the case. We were granted leave to file an amended complaint, and then there was going to be some discovery done thereafter.

THE COURT: Okay.

MR. SAMOVALOV: And so everything had been stayed because they came to us with an actual -- I have e-mail with terms of the settlement, which we've met every single term.

THE COURT: Okay. So I have on June 17th, I indicated

in an order that you filed a third amended complaint naming a new defendant, Saulius Laurynas.

MR. SAMOVALOV: That was done, your Honor. And subsequent to that, there was another defendant.

THE COURT: Another one?

MR. SAMOVALOV: Aiste Rimkute, who is his wife, that we got information from Arthur -- is another defendant in the case --

MR. GOODE: Former employee.

MR. SAMOVALOV: -- former employee -- that she was the one that --

MR. IESYPOV: Former employee with GTS.

MR. SAMOVALOV: And Team Line, as we understand it. And so your Honor gave us I think -- I'm going off my memory -- I believe it was August 16th or 18th to file the amended complaint, but that was stayed because of the settlement offer.

THE COURT: Okay. All right. So I'll tell you what. On next Tuesday when you file your motion, I also want a status report on the case -- okay? -- where we're at, what complaint we're at, who is in the complaint --

MR. GOODE: Written report.

THE COURT: -- who has answered, and then, you know, what discovery needs to be done because I'll set briefing on the motion for -- to enforce. But while that is pending, I'm going to figure out whether I'm going to make you get back to

discovery or not. I don't -- I hate to do that because if I'm going to enforce the settlement, I don't want you wasting time --

MR. GOODE: Do you want this --

THE COURT: -- and money.

MR. GOODE: -- to be a joint status report in writing?

THE COURT: Yeah.

Okay. And you should get involved in the status report too because you might have other things to say.

MR. KOZLOV: I will.

And as a part of this discussion, if they file motion to enforce, besides other maybe legal defenses that we have, my client also asserts that TRAFFIX somehow pushed them into this conversation. They saying that they made an offer; my clients saying they did not make an offer. I'd like to have a brief discovery, maybe deposition of TRAFFIX people that were involved.

I also have an e-mail from their chief director of operations, I believe, who, without presence of their lawyer, send me an e-mail saying -- threatened the business pretty much, saying you're going to lose X amount of money if you don't do this.

And counsel informed me himself that if they filed fourth amended complaint, it's going to be a nuclear bomb for TRAFFIX. That's one of the defenses that I'd like to assert is

for my clients that they acted under duress, pressure, and coercion.

MR. GOODE: Judge, can I just say that we have no knowledge of what occurred.

I know this. After we were in court before you a week or two ago, we sat for an hour and a half outside here, and we had a very helpful, completely detailed analysis of where we all stood to resolve this case. And none of this came up during that meeting.

MR. SAMOVALOV: And TRAFFIX's attorney can confirm. He was here in court as well.

MR. GOODE: So we never heard of this before.

MR. JARZYNA: And if I could just say that I'd always made clear that TRAFFIX will adhere to all of its contractual obligations.

And I think the reference that he's making is when I'm saying, like, rather than just settling this, rather -- we don't want everything to go nuclear or something. I don't remember exactly, but I was certainly not saying that there was a nuclear bomb on Team Line.

MR. KOZLOV: And, again, I'll provide my affidavit as to this conversation.

And after that conversation that plaintiff referred to, there was another conversation between him, my client, and me by Zoom, three-way conference, where -- after which Roman

told me that they never agreed to this $3 million. They asked him for assurances. They told him no.

MR. GOODE: This was all after the agreements were made. We don't know anything about that.

THE COURT: Uh-huh. Yeah, this is not -- okay. So I guess what I would say is this: If you want to do discovery at this point on this third party --

MR. KOZLOV: Yes.

THE COURT: -- I mean, first of all, you're going to have to file a motion because you're basically serving a subpoena. I mean, you can serve the subpoena and they can do a motion to quash, or you can ask leave of the Court to file a third-party subpoena. Since discovery is currently stayed because you've resolved the case, I'm going to order you to file a motion if you want to do third-party discovery.

And I'm going to ask you to serve it on counsel since he's already been good enough to come to court, even though he's not even in the case. And I'll allow you time to object to it. And then, you know, that's a separate motion.

I mean, I'm -- right now I'm in a position where discovery is stayed for the benefit of you because you're working out a case, and I'm trying to preserve everybody the cost of doing discovery -- mostly your client paying you to do discovery -- so that, you know, all the money can go into paying off the settlement.

So now you're telling me you want to open up a second front and do discovery on the hand that feeds, apparently, to convince me that your client entered this settlement agreement under duress. I don't even know if that's a thing in terms of settlement agreements, so you should give me some law on that.

I mean, I don't know. Is that -- is that a concept in contract law, that you entered a contract under duress and so that obviates your obligation to perform the contract? I would check that first because that's going to be my question to you because that's what you're asking me to take discovery on.

MR. KOZLOV: Yes.

THE COURT: And I don't know that area. I mean, you hear me out here saying I don't know this. I know a lot about enforcing settlements, but I don't know if you can get out of a settlement based on this kind of duress that you're alleging, and I don't know if you go to mediation in the midst of an agreement if you then basically withdraw the understanding that you have a firm settlement agreement. So those are two things I just don't know the law on that.

So I would look into that before I fire that shot across the bow at the company that keeps your company alive. I mean, unless you have a lot of other contracts -- I don't know -- but I would just think about that as a business matter. But I'm not the business person here.

So it's getting more complicated.

MR. GOODE: All I can say is that if there's a thought of duress, it certainly had nothing to do with us.

THE COURT: No, I know, but --

MR. GOODE: So it shouldn't affect the agreement.

THE COURT: Well, I don't know that.

MR. GOODE: If there's a problem --

THE COURT: It might --

MR. GOODE: -- it might be a separate action that they have with TRAFFIX unrelated to this.

THE COURT: Well, Mr. Goode, if as a matter of law a person can say I was under duress so I couldn't enter this contract, then I have to take that into account whether you knew about it or not. I just am telling you I don't -- I've never heard of that in a settlement context.

MR. GOODE: Me neither.

THE COURT: I've heard about it in making a confession in -- you know, in a police context, but I haven't heard about it in this context.

MR. GOODE: Exactly what I was thinking.

THE COURT: Okay. So you have some homework to do.

And you have some homework to do if you want to go to mediation.

I would recommend mediation because it seems like everybody's intent is to get this resolved as opposed to litigate it, like, take-it-to-a-jury litigate it.

MR. GOODE: I have a question.

THE COURT: And I'd be happy to try to help do that, but I think you need to figure out if you can do that.

MR. GOODE: I have one question.

THE COURT: Yeah.

MR. GOODE: We've done this now three times where we have gone to the well, listened to opposing counsel, listened to their offers.

THE COURT: Yeah. It's very frustrating.

MR. GOODE: And every time we say yes. There's nothing more we can do at a mediator other than to say yes again.

THE COURT: Yeah, very frustrating.

MR. GOODE: We keep saying yes, and they keep saying great. And then we turn around, and it's really not yes.

THE COURT: Yeah.

MR. GOODE: So I don't know what to do.

THE COURT: Yeah.

You see where they would have trouble trusting you, trusting your word. You understand that.

MR. IESYPOV: Yes, your Honor. But when I'm getting the text messages that I'd better be killed --

THE COURT: I can't hear you.

MR. IESYPOV: When I'm getting the text messages that I'd better be killed and everybody would be happy, I think

there is a -- there is a reason for me to say, you know what? Something is not -- is not right. Something is not there.

MR. JARZYNA: That's got nothing to do with TRAFFIX.

MR. IESYPOV: Nothing to do with TRAFFIX, no.

(Unreportable crosstalk.)

MR. IESYPOV: That's Arthur Proskurinas on their side, and then they give them the tapes and the podcast, as I call it. And we came into an agreement just because we got pressure from the TRAFFIX side stating we either sign it or we're going to lose the TRAFFIX. That's the only reason.

THE COURT: Okay.

MR. IESYPOV: The only reason. When we had a settlement with them sitting on the -- on the Christmas last year, we offer them $400,000 to get it away and move on. They wanted a million. Now they want 3 million. After that, then they said if not 3, then it's going to be 5.

I would like to understand if somebody would tell me I need 10 millions, I just have to pay just because somebody is saying that?

As he said, there is a lot of things in this case. And on a lot of things, as TRAFFIX said, is going to be a nuclear bomb not just for them. It's going to be a nuclear bomb for them.

THE COURT: Okay. So I will say I think it sounds like -- you know, it's a business dispute, but I'm not sure

it's -- I don't know who your clients are. But I don't know that the clients -- it sounds like a third party sitting down with the clients as opposed to just the lawyers negotiating, but a third party sitting down with the clients and kind of explaining the law and the process and what they're potentially facing and what the allegations are might be helpful.

I'm not -- just my very limited interaction with this particular defendant, I'm not sure he's completely understanding what the potential penalties are and also what the allegations are.

And it sounds like it's maybe a bit of a Wild, Wild West industry. I don't know that. I'm guessing. But maybe a very competitive industry and with not a lot of -- there's maybe not a lot of large profit margin in the industry. Am I -- am I guessing that correctly?

MR. IESYPOV: 5 percent. 5 percent.

THE COURT: Okay.

MR. GOODE: Well, that's not true.

THE COURT: So maybe -- because we're talking 3 million, 1 million. We're talking a lot about a good amount of money here. So maybe having a neutral person hear the parties as opposed to just the lawyers jabbering back and forth would be helpful. That doesn't mean you wouldn't get your motion to enforce granted, but it might be helpful to sort of really move on. That's just somebody who's done a lot of

settlement conferences.

But you can file your motion. File your status report. Keep talking. But keep communicating with the people who really matter. Those are the clients.

Okay. Goodbye. I've got a 10:30.

MR. SAMOVALOV: Thank you, Judge.

MR. KOZLOV: Thank you, your Honor.

MR. GOODE: Your Honor, have a nice day.

THE COURT: Have a good day.

(Concluded at 10:37 a.m.)

* * * * *

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ LAURA RENKE* *September 3, 2025*
LAURA RENKE, CSR, RDR, CRR
Official Court Reporter