**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GTS TRANSPORTATION CORPORATION, ROMAN BURZA, and TOMAS STIRBYS,<br><br>Plaintiffs,<br><br>v.<br><br>TEAM LINE, LLC, ARTHUR PROSKURINAS, ROMAN IESYPOV, KHALILILLO ABDULLAEV, MAKSIM KARDASEV, SAULIUS LAURYNAS, AISTE RIMKUTE, and ROGUE CARRIER, INC.,<br><br>Defendants. | Case No. 24-cv-01633<br><br>Judge Mary M. Rowland |

**ORDER**

Plaintiffs GTS Transportation Corporation ("GTS"), Roman Burza, and Tomas Stirbys sued Defendants Team Line, LLC ("Team Line"), Arthur Proskurinas, Roman Iesypov, Khalilillo Abudullaev, Maksim Kardasev, Saulius Luarynas, Aiste Rimkute, and Rogue Carrier, Inc. ("Rogue Carrier," and collectively "Defendants"), alleging *inter alia* that Defendants stole Plaintiffs' trade secrets and hacked their private data. After months of negotiations, Plaintiffs and Defendants Team Line, Iesypov, Abdullaev, Kardasev, and Laurynas appeared to have reached a settlement agreement, but Defendants backed out before signing the agreement. Before the Court now is Plaintiffs' motion [145] to enforce the settlement agreement. For the reasons contained herein, Plaintiffs' motion to enforce the settlement agreement is granted.

## **BACKGROUND**[1]

Plaintiffs filed their first complaint in this action on February 27, 2024. [1]. On September 10, 2024, the parties indicated in a joint status report that they wanted to participate in a settlement conference before the assigned magistrate judge. [30]. That settlement conference was held on November 20, 2024, and was ultimately unsuccessful. [48]. On December 16, 2024, the parties filed a joint motion to reset the settlement conference. [51]. The parties met and conferred again, but they again failed to reach an agreement. [53], [56]. On January 21, 2025, the parties reported that they were cancelling further settlement discussions and would proceed with the litigation. [59].

Discovery commenced and continued throughout the first half of the year. On May 23, 2025, counsel for Plaintiffs, Boris Samovalov, sent Defense counsel a new settlement demand of $3 million with a deadline to respond by June 6, 2025. [145-1] at 31, ¶ 6. Defendants did not respond to that settlement demand. [145-1] at 31, ¶ 7.

On July 15, 2025, the parties appeared before the Court for a status hearing. *See* [126]. There, Mr. Samovalov reported to the Court that Defendant Proskurinas had disclosed damaging information about the Defendants to one of the individual Plaintiffs in this action. [145-1] at 31, ¶ 8. Mr. Samovalov indicated his intent to file an amended complaint to reflect the new information disclosed by Proskurinas. [145-

[1] The facts in this section are derived from the parties' public filings, their representations in hearings before the Court, and the affidavits and other evidence filed in support or opposition to the motion to enforce the settlement agreement.

1] at 31, ¶ 10. The Court granted Plaintiffs leave to file an amended complaint by August 12, 2025. [126].

On July 18, 2025, counsel for Defendants Fedor Kozlov called Mr. Samovalov to again begin settlement negotiations. [145-1] at 31, ¶ 11. That same day, Mr. Samovalov sent Mr. Kozlov a term sheet under which Defendants would pay Plaintiffs $1 million by the end of August 2025, and an additional $2 million through monthly payments over the following year. [145-1] at 31 ¶ 11. By July 22, 2025, negotiations had again broken down and Mr. Kozlov informed Mr. Samovalov that his clients were again walking away from settlement talks. [145-1] at 32, ¶ 16.

On August 10, 2025, Mr. Kozlov again reached out to Mr. Samovalov with an offer to settle for $3 million. [145-1] at 33, ¶ 18. The next day, Plaintiffs moved to stay discovery and extend its deadline to file an amended complaint, which the Court granted. [132]. Following more negotiations, Mr. Samovalov wrote an email to Mr. Kozlov on August 20, 2025 seeking to confirm that they had reached an agreement. [158-1]. Mr. Kozlov responded: "No. You have your answer." *Id.*

Yet in a status hearing before the Court the very next day (the "August 21 Hearing"), Mr. Kozlov appeared to change his tune. There, Mr. Kozlov reported that the parties had "reached a general agreement as far as the total amount of money to be paid," but that they needed to "flesh out a few things as far of the logistics [of] when th[e] money has to be paid." [141] at 3. He further represented that his clients would be "coming in . . . [a]nd hopefully we're going to polish out all of the terms today." [141] at 9. At the close of the hearing, the parties stated that they would file

a status report on August 25th informing the Court that all parties had executed the settlement agreement. [141] at 10.

The individual Defendants were present for the end of the August 21 Hearing and they participated in a negotiations with counsel for both parties immediately following the hearing. [145-1] at 34, ¶ 25. Later that afternoon, Mr. Samovalov emailed Defense counsel a revised settlement agreement incorporating updates from the parties' discussions. [145-1] at 34, ¶ 28. That agreement, like the one circulated on July 18th, provided that Defendants would pay Plaintiffs $1 million by August 31, 2025, and then additional monthly payments for the next 12 months totaling $2 million. *See* [141-1] Ex. 8 at 1.

On August 22, 2025, Mr. Kozlov left Mr. Samovalov a voice message confirming that the agreement was acceptable to Defendants, but that his clients would only sign it if Proskurinas signed it first. *Id.*

On August 25, 2025, counsel again conferred, and Mr. Kozlov again confirmed his clients agreed to the terms of the settlement and that they would sign it once Proskurinas had done so. [145-1] at 35, ¶ 30. Later that day, Mr. Samovalov sent Mr. Kozlov a copy of the agreement signed by Plaintiffs and Proskurinas. [145-1] at 35, ¶ 31. But a few hours later, Mr. Kozlov called Mr. Samovalov and reported that Defendants would not be signing the agreement, citing concerns about their ability to pay the contemplated amounts on the contemplated dates. [145-1] at 35, ¶ 32.

In a joint status report filed on August 26, 2026, the parties alerted the Court that Defendants declined to sign the settlement agreement. [139]. Defendants reported

that they refused to sign because they could not pay the initial payment due under the agreement, and that they were under pressure to agree from a third party, Traffix. *Id.*

On September 2, 2025, counsel for both parties and individual Defendants Iesypov, Kardasev, and Abullaev appeared before the Court for a status hearing. [143]. There, Mr. Kozlov explained that Traffix had "pressured them into this agreement, that it was done under duress, and they claim they cannot meet the terms as far as the number goes. And they cannot sign this document because they were pressured, coerced . . . to enter this agreement, and they refuse to sign today." [142] at 10-11. Traffix's counsel also appeared at hearing and indicated to the Court that Traffix (1) did business with both parties, (2) did not want to be "caught up" in this litigation, and (3) would end its business with one or both parties if the litigation did not settle. [142] at 6-8. Defendant Iesypov also spoke on the record (without being sworn in) and explained that "***we came into an agreement*** just because got pressure from the Traffix side stating we either sign it or we're going to lose the Traffix [business]." [142] at 22 (emphasis added).

A week later, Plaintiffs filed this motion to enforce the settlement agreement. [145]. Defendants respond that the settlement should not be enforced because there was no meeting of the minds on the terms of the agreement or, in the alternative, that they entered into the agreement under duress. [158].[2]

[2] Plaintiffs seek to enforce the settlement agreement against Team Line, Iesypov, Abdullaev, Kardesev, and Laurynas. [141] at 1. All Defendants in this action are represented by the same counsel. But only Defendants Iesypov, Kardasev, and Abullaev filed a response. [158] The Court construes Defendants Iesypov, Kardasev, and Abullaev's response as if it was adopted by Laurynas as well.

## DISCUSSION

### I. Legal Standard

"State contract law governs issues concerning the formation, construction, and enforcement of settlement agreements." *Beverly v. Abbott Lab'ys*, 817 F.3d 328, 333 (7th Cir. 2016) (citing *Sims–Madison v. Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 448 (7th Cir. 2004). Here, both parties agree that Illinois law applies, so the Court looks to Illinois's substantive law. Under Illinois law, the existence of a valid and enforceable contract is a question of law when the basic facts are not in dispute. *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir.1997). An oral settlement agreement is enforceable "as long as there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement." *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir.1995) (citation omitted); *see also In re Marriage of Baecker*, 983 N.E.2d 104, 112 (Ill. App. Ct. 2012) ("The State of Illinois encourages the settlement of claims and, to that end, settlement agreements may be oral.").

Illinois law follows the objective theory of intent; whether the parties had a "meeting of the minds" is determined by what they actually expressed to one another. *Laserage Tech. Corp. v. Laserage Lab'ys, Inc.*, 972 F.2d 799, 802 (7th Cir. 1992). "[A] mere change of mind is not sufficient grounds for setting aside a settlement agreement." *Porter v. Chicago Bd. of Educ.*, 981 F. Supp. 1129, 1132 (N.D. Ill. 1997) (citations omitted).

### II. Analysis

#### a. There existed a meeting of the minds between the parties

Initially, Defendants argue that there was no meeting of the minds between the parties and as such there is no agreement to enforce. [158] at 5. Defendants acknowledge in their brief that "[t]he parties agreed in general to the terms in relation to amounts, . . . [but] the remainder of the terms were not finalized." *Id*. They point to Mr. Koslov's August 20, 2025 email, where Mr. Kozlov unequivocally told Mr. Samovalov that they had no deal. They further highlight Mr. Kozlov's representation during the August 21 Hearing that the parties agreed on the amount to be paid but needed to "flesh out" the deadlines on which the payments would be due. Plaintiffs agree that the timing of the payments is a material term to the agreement, *see* [166] at 2, so if negotiations had ended after the August 21 Hearing, Defendants would be correct.

But the record makes clear that negotiations continued immediately after that hearing and into the next several days. Counsel and individual Defendants met in person after the hearing to discuss the terms, and later that day, Mr. Samovalov sent Mr. Kozlov a contract which contained terms for both the amounts to be paid and the dates on which those amounts were to be paid. The next day, Mr. Kozlov confirmed his clients would sign the agreement if Proskurinas signed it first. On August 25, Mr. Kozlov *again* confirmed that his clients agreed to terms of the settlement. It was not until after Plaintiffs satisfied Defendants' final condition and delivered the signed document, Defendants sought to back out. They did not initially claim either in their August 26th status report nor in the September 2nd hearing before this Court that they were backing out because they did not have a meeting of the minds on *when*

their first payment was due; they claimed they needed to back out because they could not make the first payment date *prescribed by the settlement* into which they agreed to enter.

Defendants' August 22nd acceptance of the agreement with the added condition that Proskurinas sign first functioned as a counteroffer. *See Finnin v. Bob Lindsay, Inc.*, 852 N.E.2d 446, 448 (Ill. App. 2006) ("[A]n acceptance requiring any modification or change in terms constitutes a rejection of the original offer and becomes a counteroffer that must be accepted by the original offeror before a valid contract is formed."). When Plaintiffs agreed to that term and delivered an agreement bearing Proskurinas's signature on August 25th, the deal was finalized. At that point, there were no uncertain terms that would prevent a meeting of the minds.

This conclusion is buttressed by Iesypov's statements during the September 2nd hearing where he explained that the parties "came into an agreement just because [Defendants] got pressure from the Traffix side stating we either sign it or we're going to lose the Traffix [business]." [142] at 22 (emphasis added).[3] Consistent with Mr. Kozlov's representations, Iesypov did not say that Defendants did not know what they were agreeing to; he said that they *agreed to the deal* because they were under pressure from Traffix to do so.

Accordingly, the parties entered into a valid agreement.

[3] Although Iesypov was not testifying under oath when he made this statement, the Court can consider it as direct evidence as to the contract's formation. *See Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 892 (7th Cir. 1995) (citing 2 McCormick on Evidence § 249, p. 101 (4th ed., John William Strong ed. 1992) ("[P]roof of oral utterances by the parties in a contract suit constituting the offer and acceptance which brought the contract into being are not evidence of assertions offered testimonially but rather verbal conduct to which the law attaches duties and liabilities.").

**b. Plaintiffs have not established by clear and convincing evidence that they entered into the agreement under duress.**

The Court turns next to Defendants' claim in the alternative that they entered into the agreement under duress. "Duress or coercion is a ground for invalidating the terms of a settlement agreement." *Porter v. Chicago Bd. of Educ.*, 981 F. Supp. 1129, 1131 (N.D. Ill. 1997). Defendants argue that they were under economic duress during the negotiations. [158] at 6. There are two elements of a claim for economic distress: "(1) the party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his unfettered free will." *Collins. v. Comdisco Inc.*, No. 05 C 2894, 2007 WL 952021, at *5 (N.D. Ill. Mar. 26, 2007). "Duress is not shown by the fact one is subjected to mere annoyance, vexation, personal embarrassment, a difficult bargaining position or the pressure of financial circumstances." *De Fontaine v. Passalino*, 584 N.E.2d 933, 941 (Ill. App. Ct. 1991). "[D]uress cannot be predicated upon a demand which is lawful or upon doing or threatening to do that which a party has a legal right to do." *Alexander v. Standard Oil Co.*, 423 N.E.2d 578, 582 (Ill. App. Ct. 1981) (citation omitted). The party asserting duress has the burden of proving it by clear and convincing evidence. *Flynn v. Flynn*, 597 N.E.2d 709, 713 (Ill. App. Ct. 1992). Defendants have not met this burden.

Defendants argue that (1) Plaintiffs contacted Proskurinas while he was represented by Mr. Kozlov, (2) plaintiff Stirbys solicited a damaging statement from Proskurinas that implicated Traffix, (3) Plaintiffs subsequently threatened to use

that statement in an amended complaint, and (4) Traffix threatened to terminate its business relationship with Defendants if they did not settle. [158] at 7. This conduct does not amount to an unlawful act or threat that would give rise to duress. As to the tape recording by Stirbys, while it is true that the Illinois professional rules of conduct prohibit party's *counsel* from communicating with another represented party without their counsel present, *see Scanlan v. Eisenberg*, 893 F. Supp. 2d 945, 949 (N.D. Ill. 2012), Defendants claim only that Stirbys (a party to this action) communicated with Proskurinas.[4] The Court is aware of no rule that prevents individual parties to a lawsuit from conferring with one another outside the presence of their counsel, and Defendants identify none in their brief. Defendants nonetheless claim that Stirbys "illegally obtained" a recorded statement from Proskurinas and used it to threaten Defendants. But Defendants do not explain how the statement was obtained or what about its recording was wrongful. And as to Plaintiffs' and Traffix's "threats" — in Plaintiffs' case, to file an amended complaint; in Traffix's, to end its business relationship with Defendants — Defendants offer no evidence or argument that either is wrongful or unlawful. *See De Fontaine*, 584 N.E.2d at 941. ("Duress is not shown by the fact one is subjected to . . . a difficult bargaining position or the pressure of financial circumstances."). Accordingly, Defendants fail to satisfy by clear and convincing evidence the first element of a claim for economic duress.

[4] During the August 21 Hearing, Plaintiffs' counsel Michael Goode affirmatively represented to the Court that Proskurinas had reached out to him. [141] at 5. Mr. Goode reported that he explained to Proskurinas that they could have no conversations about anything related to the case while he was represented by counsel. *Id*. Defendants do not contest that characterization.

But even assuming that they had satisfied the first element, Defendants have not identified any reason that the complained-of threats would rise to the level of "depriv[ing] the victim[s] of [their] unfettered free will" sufficient to satisfy the second element of an economic duress defense. *Collins*, 2007 WL 952021, at *5. Defendants knew that Proskurinas had given Plaintiffs damaging information at least as early as July 15, 2025. [145-1] at 31, ¶ 8. They did not agree to the settlement until August 22, 2025. "When a party has ample time for inquiry, examination, and reflection, it is less likely that his will was overborne by economic duress." *Alexander*, 423 N.E.2d at 583. Courts applying Illinois law generally hold that duress does not lie where more than a few days have passed between the wrongful act and the decision to enter (or not enter) a contract.[5] Here, Defendants had nearly *seven weeks* to consider the consequences of Plaintiffs' conduct before making any agreement. Throughout that time, they continued to hold arms-length negotiations with one another, and there is no indication they were deprived of their free will. To the extent Defendants were under duress, they had ample opportunity to change course. Instead, during the August 21 Hearing, Mr. Kozlov reported to the Court that the parties had "reached a

---

[5] *Compare BMO Harris Bank, N.A. v. Royalty Props., LLC*, 2016 WL 6269967, *as modified on denial of reh'g* (Ill. App. Ct., Oct. 25, 2016) (finding a dispute of fact as to duress where party was told they would lose $2 million in escrow unless they made a decision in one day); *Golden v. McDermott, Will & Emery*, 299 702 N.E.2d 581, 588 (finding duress where a condition of employee's resignation was conditioned on signing a release he had no opportunity read) *with Washington v. Bd. of Educ. of City of Chicago,* No. 17 CV 2343, 2018 WL 558501, at *6 (N.D. Ill. Jan. 24, 2018), *aff'd sub nom. Washington v. Chicago Bd. of Educ.*, 786 F. App'x 602 (7th Cir. 2019) (no duress where party had the opportunity to consult with an attorney during a seven-day waiting period); *Welsh v. Parker*, 2011 WL 10457493, at *9 (Ill. App. Ct. Dec. 29, 2011 (no duress where party had two days to decide whether to sign a contract and the parties were represented by counsel); *Smart Mktg. Grp., Inc. v. Publications Int'l, Ltd.*, No. 04 C 0146, 2008 WL 4287704, at *7 (N.D. Ill. Sept. 11, 2008) (no duress where parties had months to negotiate contract).

general agreement as far as the total amount of money to be paid," and then repeatedly represented to Plaintiffs that Defendants agreed to the terms of the settlement agreement. Under these circumstances, Defendants cannot claim they entered the agreement under duress.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to enforce the settlement agreement [145] is granted. The parties are to file a status report regarding next steps in the litigation by May 14, 2026.

E N T E R:

Dated: April 27, 2026

Mary M Rowland